Interjet, Petitioner v. United States Department of Transportation. Mr. Roller for Petitioner, Mr. Perry for the Respondent. Good morning. May it please the Court, my name is Moffett Roller and I'm here on behalf of Petitioner A. B. C. Aerolineas, S.A. de C. v. Doing Business as Interjet. With me at the Council table is Mr. Charles Green. In this case, Petitioner Interjet, a Mexican airline, is presenting two issues to the Court. The first issue before the Court is whether the Department of Transportation, in the course of its implementation of conditions on a joint venture, implementation on conditions on the grant of antitrust immunity to a joint venture of Delta and Aeromexico, arbitrarily excluded Interjet from the list of carriers that were eligible to apply to receive takeoff and landing slots at Mexico City International Airport, MEX, for short. Secondly, Your Honors, well... You don't have to go through this. We've read the briefs. All right, sir. I'll just say that the second argument was arguing in the alternative that the Department does not have authority to do what it did do. The second argument, in a way, inconcretious arises from the fact that the Department decided that Interjet would not be eligible to participate in the proceeding because, according to the Department, Interjet already had too many landing slots at MEX. We respectfully disagree and we argue strongly to the Department to that degree. In fact, Your Honors, the Department in its own established criteria in conducting the competitive proceeding that it did, it said, and I'm looking at the instituting order on Joint Appendix 279, that their objective was to provide the maximum competitive benefits from new, preferably daily, services to, from It is our contention, Your Honors, that the pure size of Interjet slot holdings at MEX was not a determining, should not be a sole determining factor in whether Interjet should be allowed to participate. It felt Interjet had a great deal to bring to this proceeding and it should be allowed to compete. Doesn't the statute itself indicate that the Department is to consider undue concentration? Isn't that, actual concentration is the word used in the statute? I'm not sure that actual word is used in the statute. I seem to recall reading in the brief that the statute specifically uses the word concentration. It used the word reduce competition, or it could not reduce competition. But it also, I thought it said specifically refers to concentration. I think Judge Silberman is referring to 401.01, which are the policies that the Secretary is to take into consideration, and that includes the words avoiding unreasonable industry concentration. Right. Well certainly, well certainly the younger colleague helps me out whenever he can. Well certainly, Your Honors, the whole objective of the divestiture requirement was to temper the antitrust power that was being granted to the joint alliance between Delta and Aeromexico. That indeed was the whole rationale for the imposition of conditions that led to the divestiture of the 20, the 20, at MEX. We are not challenging that in this appeal. We are challenging the fact that in the subsequent proceeding that the Department held to allocate those slots among a group of third party carriers, we are, our position is that it was arbitrary. Energet had the second largest number of slots at Mexico. It did. So that, why isn't, why isn't the, why don't we have to defer to the agency's determination that's undue concentration? Well the undue concentration. The energy that was allowed to compete for those. The undue concentration, Your Honor, is not the undue concentration with regard to slots. It's undue concentration with respect to the market power and the transporter market. You know, the agency has to apply classic antitrust theory to this. Yes, sir. And, but the agency is not obliged to apply Chicago School of Economics. Well, Your Honor, let me just say that it is not, I respectfully submit, within the scope of the Department's authority under to regulate the slot holdings or the degree of the slot holdings at a foreign airport. That's going to be your second argument when you start. Yes, that's right. But with regard to your point in terms of the significance of the slot holdings at NEX, the Department said that because the Department, so we have a situation where the joint applicants together held about 50%. Enerjet was next at approximately 26%. And then we have, with approximately half of Enerjet's, we have another competitor, which is Volaris, which had 115 slots. A significant number, I submit. But you have 200 more. That is, yes, sir. That's correct. So, just to get you with my older colleague, even classic economic theory, having three competitors is better than having two. And having three of larger size is better than having two and an even smaller one. So, I don't understand the presumption that the government's operating on here is that rather than give to another large competitor, in oligopoly theory, you would try to give to the next smaller competitor. And so, you'd have three serious competitors instead of only two. What's your argument on the other side of this? The argument on the other side of this is that what you want to do by the Department's own standard of providing maximum competitive benefits is you want to have as many carriers as possible. I agree, providing transporter service to temper the joint alliance. And by unilaterally excluding Enerjet. It's not excluding them. They still have 25% of the slots, which according to the Department of Transportation, you're not even using yet. But the fact that that is a finding by Confessian and also the Mexican Antitrust Agency that the Department quoted, but it also applies to Enerjet's competitors that were allowed to compete. Obviously, the more slots they have, the more competition they can provide. That doesn't necessarily follow, Your Honor, because the Department made no findings in that exact regard. Because Enerjet has an extensive domestic network. And it uses these slots to provide domestic service. And compared to the domestic service that Enerjet provides, the transporter service is very limited by comparison. So, the question then comes, if Enerjet is excluded, would it yet provide as much competition as it received additional slots and was able to provide additional competition in the market? There was no finding to that effect, Your Honor. Where did you make the argument that the domestic service makes a difference in this regard? The argument you're making now. Yes, it was in our brief, Your Honor. I appreciate that. Where was it in your presentation to the DOT? It was in the... Is there a place in their joint appendix you can cite? It would take me a moment to find it, but... You'll have a rebuttal chance. Likewise, on page nine of your reply brief, you make a number of arguments, none of which I can find in the opening brief, about Enerjet's baggage policies, operational reliability, ancillary services. I don't find any of that in the reply to the agency, and can we find that in the joint appendix? Yes, sir. We will find it by the time of the rebuttal. So, the argument is that it is not a foregone conclusion to say that because Enerjet has slots that it will automatically use those slots to be an ally of the joint alliance. But you could. Potentially, if it was in our economic benefit, but to do so, but the department did not make that determination. Why should the department think that giving even more slots will make it more likely you'll provide competition? If you're not using the ones you have... I do not know. It's not in the record, Your Honor. Well, I thought that the agency said that that was the case, that you were starting to increase the use of your slots, that there is data that 26 percent or something of the slots are not being used. Could you put in any evidence that you are using all of your slots? No, Your Honor. I don't think there's any information either way in terms of the record. The record doesn't specify how many slots you are not using? No, sir, it does not. Does the record indicate how many slots you are using for internal transportation within Mexico? No, sir, it does not. Well, you were just making that argument. I don't understand how you can make the argument if you didn't even present it to the agency. Well, Your Honor, there... And what's sort of troubling is if you have slots that you're not using, it seems to me that your objective is to prevent other people from having the slots. Oh, no, not at all, Your Honor. And there was a... the reference finding that you mentioned was a determination that was made by the Mexican agency regarding the unutilized slots, and the Department cited that. That was a general... that was a general observation, but it was not a carrier-specific observation. And so the Department... Well, here you're making the argument that your slots... some number of the slots you have, you're using for internal Mexican travel alone. Yes, sir. How many of those fall in that category, and did you present that to the agency? Your Honor, we didn't really have a... no, Your Honor, we didn't, but we... that would have been a consideration that we would have presented to the agency. Why are you making the argument here if you didn't even make it before the agency? Because we really... we weren't allowed to. We weren't allowed to come in and compete for the slots. Why weren't you allowed to put in the evidence? That's the part I'm not following. You did make arguments. The original order to show cause was in November of 2016. Final order was in December. It reports what arguments you made. Did the agency bar you from putting in any evidence to support your arguments? No, we did make the argument, Your Honor, that we had extensive... we just... there were not numbers, but we did make the argument that Interjet was committed to using a large portion of those slots for domestic... it was using those slots extensively for domestic service, and we did argue that it was incumbent upon the department to let us come to the proceeding so that the department could evaluate those factors. We did make that argument, Your Honor, even though there were not specific numbers attached to it. You're into your rebuttal time, and let's just... Yes, and I'm sorry, but I want... there's someone who looks like he's about to ask. No, I'm not. Okay. But I really want to touch on the second argument, Your Honors, because that is a very important alternative argument, which is that the department does not have the statutory authority to do what it did here. The first argument assumes that the department had authority to conduct this proceeding, the secondary proceeding. The second argument says, in the alternative, the department does not have authority under 41, 308, and 309 to conduct this extensive secondary proceeding. It is certainly... You mean the slot allocation? The slot allocation If we agree with you then, you lose your slot at Kennedy Airport. Is that right? No, sir, because... Why does it have authority to give you a slot at Kennedy Airport? Because, well, first of all, we have not challenged the allocation of the slots. But if you're telling me they are without authority, and we hold that they're without authority to allocate slots, then any of the other competitors at Kennedy can now come in and say, you've illegally been That could happen. Your Honor, our position on that is... Wait a minute, I'm confused. Are you saying that they have no authority to allocate slots at all, or are you saying they have no authority to allocate slots in a foreign country? Which of those arguments are you making? We are arguing that they have no authority to allocate the slots at MEX, Your Honor. That's the end of that argument. Only at MEX are you... Yes. However, I'm sorry. I thought you were also arguing that they don't have authority to allocate slots at all, that they can only approve or not approve. Is that right? We were... Look, they can't impose conditions on... They can either approve or not. Is that right? With regard to the United States allocation of slots at JFK, we did not challenge that. And I... And for... I want you to say why. Because it's in the United States. Your argument about the allocation of slots at this point concerns only those at MEX, correct? Right. However, I understand what you're asking, Judge Garland. Now, that however just ruined my understanding. If there's well-placed. And to the extent that the argument at MEX throws into question the allocation of slots at JFK, our position is that that is an issue that the Department should be allowed to address on remand. Because at JFK, the Department does have additional authority over U.S. airspace takeoff and landing slots at JFK. It is... We've not argued in the briefs about that at all. And so it is plausible that... Is it or is it not your argument on this second point that they did not have the authority to regulate slots at MEX? That is correct, Judge Sentelle. And... Would you quit going to the other airports then and If it's not the case that it concerns the other airports, stick with MEX and admit that it has no bearing on the other airports. Well, I agree that it has no bearing on the other airports. Good. So quit putting the butts after every time you say that. I was just trying to answer the questions, Your Honor. So you agree that with the exception of foreign Is that right? Your Honor, we do not dispute the ability of the Department to impose reasonable conditions on the imposition of antitrust immunity, such as the divestiture of slots. What about the assignment of slots? We object to that, Your Honor. Now, my understanding was at Kennedy, it was assigned to you, not just that they had to divest, but that they had to give it to you. Is that wrong or right? That is the consequence of what the Department proceeding at JFK did, yes, Your Honor. So was that a reasonable condition or not? At JFK, it is our... We've not addressed that, but yes, as far as we are concerned, that's a reasonable condition at JFK. But we've not addressed that. In other words, I understand your position here. The Department of Transportation has no authority to allocate slots except to Interjet. Except what? Except to Interjet, which has a special position that you can allocate slots. No, no, no, Your Honor. Is that right? No, I'm not saying that. Well, that's in effect what you're saying, because Judge Garland has pointed out your argument was the agency can't allocate slots at all, but on the other hand, it's okay to allocate them to you. Well, there were two alternative arguments, as I'm sure you understand. Of course. And so one, of course, does assume that they have the authority to do that. And on that one, we're arguing our exclusion was arbitrary. But as far... Well, you better get to the second argument. But as... Well, that's what I have been on, is the second argument, that they have no statutory authority to allocate the slots at MEX. Because of what? Because it is the... Because what they've done is an exercise of air transportation regulation that goes far beyond what the Department is authorized to do by imposing reasonable conditions under 41308 and 309. You mean because this is unreasonable? The conduct of saying carrier X gets this slot at MEX, carrier Y gets that slot at this time, and that you have to come back to us... The agency did not allocate slots at MEX. Oh, it did? No, it didn't. It said it would agree to giving antitrust immunity if those slots were allocated by, of course, the Mexican authorities. We're doing a little bit in semantics because the And at other times it used the word assign. But it's clear that the implication of their reading of their order is that this would be true only if Mexican authorities went along with it. That is true. The Mexican authorities did go along with it. But it is our position, Your Honor, that it violated U.S. law to conduct this elaborate secondary proceeding, which is a form of route regulation. The Department has no authority to regulate the transborder market by saying carrier X flies from A to B, and this carrier gets this. But at this point in time, did it lead to that situation? The Mexican authority accepted it, but that begs the question, Your Honor, of whether the Department had the authority under U.S. law to do it. And I see that my time has well expired. Thank you. Thank you. We'll hear from DOT. Good morning. May it please the Court, Christopher Perry for the Department of Transportation. In this case, DOT made a reasonable decision to make Interjet ineligible for Mexico City slots due to its significant presence at that airport and made the rational choice to make those remedy slots available to other carriers that face the most significant structural barriers at the airport. Those were low-cost and low-fare carriers based in both Mexico and the United States that had either a small number of slots at that airport or no slots. Interjet, it's not contested, was one of the two dominant carriers at the airport besides Aeromexico, which is one of the joint applicants. So in this case, the Department's decision to exclude Interjet was to... I'm a little confused. What about the two legacy carriers? Correct, Your Honor. DOT's criteria for making eligibility determinations were twofold. First, we decided to only make the slots available to low-cost and low-fare carriers, which we had decided in past cases... No, my recollection, is it United and Delta? No, United and somebody else. United and American, Your Honor. Correct. They had a lot of slots, too. They had, correct, Your Honor, certainly smaller than Interjet, but in the way of a couple of dozen. And in that instance, the Department's decision was to say legacy carriers were not going to have the same competitive effect. That was the other aspect of our criteria. Now, here's where I have a question with respect to the second argument here, the authority. What is the limit to the conditions that you can impose? Well, Your Honor, they have... When you sit down as a lawyer and advise the Department of Transportation as to what conditions they can impose and what they can't, what is the limitation? Correct, Your Honor. I think they're twofold. In the first instance, if there were a statutory interpretation question, which there really isn't, that would be a Chevron question. In the second instance, we would be in APA reasonableness. No, no. I'm asking what limitations were there? Is there no limitation on the conditions that the Department of Transportation can impose on the approval? There are limitations, Your Honor. What are the limitations? Well, I think it's a standard of reasonableness. In that respect, we would agree with what Interjet is saying, and that is essentially their same primary argument, which has to do with whether or not our divestiture remedy was an exercise of reasonableness under the APA. And so we disagree that this was actually an allocation that occurred in Mexico City beyond our authority. All we did in this instance was to say we have two parties coming... Suppose Mexico had disagreed with you. Suppose Mexico was here. Correct. And saying this is an unlawful effort on the part of the Department of Transportation to regulate affairs within our countries. What would your position be? Then, Your Honor, it's simply no deal. So in this instance, the parties have to approach both countries' authorities and say, here's the deal I want. Here's what I'm asking you for approval under both countries' laws. If there's overlap between what those two countries decide ought to be the standard and... Suppose Mexico was saying this is unlawful for the Department of Transportation to reach into regulating our airport. Had they so decided, Your Honor, they could have. And in fact, the airport authority then could have actually refused to grant the slot transfers, which... No, but suppose they were in this court claiming that the Department of Transportation's behavior was illegal. Then, Your Honor, I suppose the court wanted to defer to that. But at the end of the day, if they didn't approve it, which they could do under their own law, there simply wouldn't be a deal. There wouldn't be any need. So in this instance, the question is simply, is there effective overlap? So is there any limitation to the kind of conditions you can impose in foreign airports? Anything at all? Yes, Your Honor. We wouldn't be able to actually do anything to regulate or effectuate any regulation of conduct in that country. All we can do is impose a condition that we place upon the parties to say, do this if you wish. So there is no limitation on what you can impose on the parties? None? I respectfully disagree, Your Honor. I think, again, it's subject to a Chevron standard and a reasonableness standard. And I think what we did here is reasonable. In this instance, if the Mexican government... The Chevron standard doesn't tell us anything at all. No, I don't even understand that. What kind of limitations would there be? Forget what standard you're judging them under. Where does that line draw that you say is there? Well, if we were actually telling Mexico what they must do as a matter of their law or process or authority, or telling the airport authority what they must do, that would be an extraterritorial exercise of our sovereignty. That's not what happened. All we did was impose a condition that the parties could either accept or leave, or if the Mexican authorities had wanted to reject it, they could. Now, if the Mexican authorities rejected it, what would have happened at that point? Simply no deal, Your Honor. You would have denied antitrust immunity is what you're saying. Correct, Your Honor, or it simply would not have entered into force. It would have become moot. So if COFESA, the Mexican authority, had simply wanted to say, we don't think this is a good deal, or we're going to do it with our own conditions, they could have done that, or they simply could have rejected it. The area of overlap between the two countries' orders and remedies is the area of effective opportunity for the parties to carry forward the deal. Much like, for example, if somebody wants to get a building constructed, they might have to get permits from multiple different authorities. No one's telling you you have to do it, but we are saying you have to collect these permits from these different offices within their expertise to carry it forward, whether that be fire or water or whatever it may be. Is DOT's approval required for the joint venture to operate, or only for the joint venture to have antitrust immunity? To operate, Your Honor. Where is that in the statute? I don't think it's particularly relevant to the case, but I'm just interested. The section we've been looking at is the exemption for antitrust immunity. That's correct, Your Honor. So 41308 and 41309 are the two governing statutes. Where does it say they can't operate? They can operate, but then they just risk being sued under the antitrust law. Well, that's correct, Your Honor. I think a couple of things would happen. First of all, these carriers have to be permitted both in our country and in Mexico, and so there would also be vulnerability with respect to whether or not they're operating within their permit, their certificate of public convenience and necessity. They're standing there as public convenience and necessity. Correct, Your Honor. I take it that when you say the conditions have to be reasonable, the content of reasonableness is provided by 40101, which are the factors that the Transportation Secretary has to take into consideration? Yes, Your Honor. At least those are the factors that would also, we think, be read through 41308 and 41309. They're generally governing provisions. Yes, but so you couldn't just pose any old condition. It would have to be a condition relating to reliance on competitive market forces, avoiding unreasonable industry concentration, that sort of thing. Correct, Your Honor. That would have been your answer to my question. It is a good answer, Your Honor. I try to help out everybody. So returning to Interjet's primary argument with respect to arbitrary and capricious review, the decision was also internally consistent. We applied the same rationale to exclude JetBlue at JFK, and in that instance JetBlue was also the second-largest carrier by a substantial margin. That decision was what allowed Interjet to actually be eligible and get the slot that it wanted to at JFK. That was one of its primary objectives in this proceeding, was to get a slot at a more commercially beneficial hour. In the next respect, Interjet says that they're being punished for their success. They're not. All we're doing, again, is imposing reasonable conditions, and rather than trying to look at Interjet and say you're doing something improper, we're simply taking the fact of their position and saying we need to account for that in the reasonable analysis if we're looking at competitive conditions at that airport as a whole and trying to address structural problems. Is there any way in which the process was structured that prevented Interjet from putting in any evidence that it wanted with respect to its competitiveness? No, Your Honor. They could have and did repeatedly. We had multiple show cause orders, multiple different orders at the assignment phase as well. Even after we put out a show cause order in the slot assignment phase last March, Interjet submitted another filing in which it renewed its objection with respect to their exclusion, and we addressed it yet again in our final order on the merits in April, which is the second order that's under review here. So we were happy to receive their submissions repeatedly. It just so happens that getting additional data about factors like baggage, other things that Your Honor mentioned that were in the reply brief, those were not brought before the agency at that stage. They would not have made any real difference because what we were addressing were structural problems at the airport, not problems or questions with respect to their service. And what was the evidence in the record about how many of their current slots they were using? So, Your Honor, if you look at Joint Appendix page 334, which is our final order under review, we addressed Interjet's arguments on the merit again and said, Interjet operates more than 25% of the slots at MEX, which is not contested, and said second incumbents at MEX, including Interjet, do not use 37% of their slots on average. So that's an aggregated figure. It says Interjet did not dispute either of those data points, which are derived from official Mexican sources, which is the Capasi report. We'd be happy to look at anything that Interjet put in the record. It was JA334, Your Honor. We'd be happy to look at anything put in the record, but we have to look at the record that's put before us, and that's precisely what we did. We can't simply guess at what Interjet's doing, nor do we have a burden to say that they will only do this if it's in their commercial interest. They have to tell us what they're going to do. Furthermore, even if they're not using any of these slots for international service right now, it's our view, and it's supported by economic theory, that the fact that they simply could is itself something that could help to competitively discipline the two major carriers here in this instance. If you're Aeromexico and your second carrier breathing down your neck is Interjet, you can simply say, well, they're not using this for this service now, but if I raise my price too high, they might be able to flip over and capture some of that market. So we did that as well. Are there no further questions? Apparently not. Thank you, Your Honor. Is there time remaining? All right. Your opponent graciously did not use all of his time, so we're going to let you have two minutes of his time. It's a good thing I didn't tell him that in advance because he would have run out of time. Thank you. Your Honor, with regard to the – I was not able to find it in the brief time, but I do believe that we indeed did make the argument, certainly about the domestic network, to the Department in the course of the various pleadings that we made. But – How many slots are you not using at all for either domestic or foreign? I do not know that, Your Honor. Why would you not know that? Your Honor, the reason – Your counsel in the Court of Appeals, why would you not know that? Your Honor, the reason – And isn't that sort of suspicious? Why the devil would you want more slots if you have a lot of slots that you're not using? Is that because your real objective is to prevent anybody else from having the slots? Oh, no, no. Of course not. No, not at all. To the best of my knowledge, interject, whether, Your Honor, I shouldn't. I can't testify. But, Your Honor, to a large extent, some of this information that is missing is missing because we were not allowed to come to the party, if you will, in which we could make arguments regarding these issues. This is the part I'm not understanding. And it worried me when you first said it. I asked the Department of Transportation. They said you could have submitted any evidence you wanted. The orders reflect the fact that you made arguments. Yes, sir. Can you point to some document or instruction of the Department of Transportation that says you can make arguments but you can't submit evidence? What do you mean by the phrase, we weren't allowed to come to the party? By the phrase, we were not allowed to participate in the slot allocation proceeding at MEX. But were you not allowed to respond to the order to show cause with evidence? Yes, Your Honor, we certainly were. But I guess all I can say, Your Honor, is that it's easier in hindsight perhaps to see some of these things than at the moment. But we certainly argued to the Department on the arbitrary issue that we had a far – there were other considerations other than that particular issue. And the other issue that we did argue was that we had a far smaller portion of the transborder market than did some of our competitors who did receive slots. And we argued that that was an indicia of arbitrariness. But if I might switch to the statutory authority question again, I would just like to make clear that, yes, we do limit – we limit our argument to MEX. But to the extent that the court has any concerns about that and says that it draws in JFK, it's our position that that's an appropriate matter for the Department to undertake. Any implications of that are for you to remand it to the Department for further consideration there. But in terms of the statute – So I just want to be clear I understand this argument. Yes. So you agree that with respect to domestic airports, the Department is free to impose reasonable conditions on whom the slots in a divestiture are allocated to? Your Honor, I am not – Under the statute. I'm not – we are not addressing that right now. Well, I know, but today you are. So I just want to know – I want to know your interpretation of the statute. Do you agree that it permits DOT, when it orders a divestiture, to also say the slots have to go to this company or that company, as long as it's reasonable with respect to antitrust competitiveness considerations? It is our position, Your Honor, that the Department has authority, whether it derives solely from 41308 or 309 or from other sources which we haven't addressed. We are not – we agree that the Department has authority to do that in the United States. I see. So then your argument is just limited to the contention that this effectively subverts the sovereignty of Mexico. Is that right? And it – and we're also arguing, Your Honor, that the Department does not have the authority insofar as this slot allocation proceeding goes to do that. They have the authority to impose reasonable conditions. A reasonable condition would say you must divest 24 slot pairs. That would be reasonable. Now, wait. I just want to again be clear. In a domestic airport, do you agree that if it were reasonable, it could order divestiture and allocation? I agree that at a domestic airport the authority – I'm not saying that it's necessarily based on 41308 or 309. What is it based on then? Well, as I said, Your Honor, we haven't undertaken to address that. Do you think it's inconsistent with those sections for a domestic – so imagine a situation in which the choice of divestiture is to go to the second largest airline, which is 200 times more powerful in terms of slots than anything else, and instead the department says if the biggest airline is going to divest, it has to give it to the smallest airline. Would it have that authority under this section? Or do you think it would violate the sections that we're talking about here? I want to make sure I understand your hypothetical.  Imagine that the agency decides to, one, divest, and two, for very good antitrust reasons, whatever they are, assume that they are perfect antitrust reasons, decides to give it to a small airline rather than to a large airline, and says if you're going to divest, you have to give it to this small airline. Does it have that authority for a domestic airport? Or is it invalid under any of the statutes we're considering today? I think under that example, Your Honor, I'm thinking carefully. It's difficult to say for certain, but as best as I understand the example, I think if that was the limit of it and it was just giving it to a particular carrier, again, without knowing all the facts, I'm inclined to think it probably does have that authority, the department. But it's difficult to say in the abstract, Your Honor, but I believe so.  Thank you, Your Honor. That is my final submission. Thank you.
judges: Garland, Silberman, Sentelle